**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

In re Robert O. Copeland and
Pamela K. Copeland,

Debtors.

Bky Case No. 99-40290
Adv. Case No. 99-4061

---

Lynne Goughler, Barbara Davidson, Hazel Davidson, and Gail and Robert Atkins,

Appellants,

v.

Robert O. Copleand,

Appellee.

Civ. No. 00-222 RHK
**MEMORANDUM OPINION AND ORDER**

---

Lawrence H. Crosby, Crosby & Associates, Saint Paul, Minnesota, for Appellants.

Mary Jo A. Jensen-Carter, Buckley & Jensen, Saint Paul, Minnesota, for Appellee.

---

**Introduction**

Appellants Lynne Goughler, Barbara Davidson, Hazel Davidson, Gail Atkins, and Robert Atkins (collectively "Appellants") brought an adversary proceeding seeking a determination that Debtor Robert Copeland's ("Copeland") obligations to them were non-



FILED SEP 06 2000
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD SEP 06 200(
DEPUTY CLERK

dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4).[1] At the trial on the adversary complaint, the bankruptcy court[2] took testimony for three days. On January 3, 2000, the bankruptcy court filed its Findings of Fact and Conclusions of Law, and entered judgment in favor of Copeland.

Appellants timely filed a notice of appeal to this Court. This Court has jurisdiction to hear appeals from final judgments, orders, and decrees entered by the United States Bankruptcy Court. See 28 U.S.C. § 158(a)(1). For the reasons set forth below, this Court will affirm the judgment of the bankruptcy court.

## Factual Background

Prior to trial, the parties stipulated to several facts that the bankruptcy court incorporated into its findings. Based on those stipulated facts, and the facts found by the bankruptcy court which Appellants have not challenged on appeal, it appears that Appellants' claims against Copeland arose from the following events.

Copeland was employed by Allstate Insurance Companies ("Allstate") from 1975 until April 30, 1998 . During the 1990s, Copeland was an "agency manager" for Allstate.

---

[1] Appellants originally asserted that the debt owed to them was attributable to both Copeland and his wife, Pamela. Before the trial, however, Pamela Copeland was dismissed as a defendant and a judgment of dismissal was entered in her favor.

Appellants also opposed Copeland's discharge in its entirety pursuant to 11 U.S.C. § 727. At the close of Appellants' case in chief, Copeland moved for judgment on that claim. Appellants apparently offered no opposition to the motion, and the § 727 claim was dismissed.

[2] The Honorable Nancy C. Dreher, United States Bankruptcy Judge.

In or about September of 1991, Copeland recruited Paul Melby ("Melby") to become an Allstate agent. Until Copeland quit Allstate in April of 1998, he was Melby's agency manager.

Melby was an ambitious agent who wanted to grow his agency rapidly. Allstate regarded Melby as extremely successful, giving him many sales-based awards. By March of 1993, Melby had incorporated his own agency, called DELCAR, Inc. ("DELCAR"), of which Melby was the sole shareholder. To expand his business rapidly, Melby needed continual infusions of capital. At first, Melby borrowed money from his personal credit card accounts in order to pay business expenses such as payroll. By late 1996, Melby had accumulated approximately $92,000 in credit card debt. Furthermore, in 1995, Copeland found a third-party who agreed to lend Melby $150,000 for his insurance business. Despite these infusions, Melby still needed money; specifically, Melby wanted to purchase other agencies.

In the mid 1990s, Allstate announced its plan to become the largest and fastest-growing insurer in the country. To accomplish that goal, Allstate decided to allow its "agent/employees" to become independent owners of their agencies. Allstate guaranteed that the agents, as business owners, would have an "equity interest" in their agencies.[3]

---

[3] The guaranteed equity interest -- referred to in the Allstate agency agreement as a "termination payment" -- was calculated as (1) a percentage of the agency's earned premiums for the twelve calendar months preceding the effective termination date, plus (2) a multiple of the agency's renewal credits on personally secured life policies for the twelve calendar months preceding the effective termination date.

Allstate hoped that the guaranteed "equity interest" would give agents an incentive to grow their businesses because the more successful an agency was, the larger the guaranteed equity interest would be. If Allstate's agency agreement with the agent was terminated for one of several reasons -- such as the agent's death, incapacity, or by the mutual agreement of the parties -- Allstate would pay the "equity interest" to the owner as a "termination payment."

Melby used this guaranteed "termination payment" from Allstate to obtain loans from, among others, the Appellants. In exchange for lending money to DELCAR, the Appellants received two documents. These documents were drafted by Richard Poulton, an attorney and "life specialist" for Allstate who officed with Copeland. The first document was an "Evidence of Corporate Obligation" ("ECO"). The ECO was essentially a five-year term note from DELCAR in the principal amount of the loan which paid interest at 10% per annum. The ECO provided that DELCAR would make monthly interest payments during the life of the loan and repay the principal at the end of the five-year term. The ECO stated that DELCAR would be in default "in the event the corporation does not make payment within 90 days of scheduled Monthly payments." If DELCAR defaulted,

> the undersigned Paul Melby, the sole shareholder of DELCAR Corporation, agrees to submit the agency to Allstate Insurance Company under the provision of his redemption agreement and turn [sic] the proceeds received from Allstate to satisfy the remaining obligation to [Lender].

Paul Melby signed the ECOs as "President DELCAR Inc., Borrower." Copeland signed as a "witness."

The second document Appellants received was a "Collateral Trust Agreement" ("CTA"). This document, which lies at the heart of the Appellants' claims against Copeland, states in its entirety as follows:

> This Trust Agreement, made and entered into in the City of Minneapolis, this [___] day of [____], [ ____], by and between: Paul Melby, sole owner of DELCAR Inc., DBA Allstate Insurance, hereinafter referred to as the Settlor, and Robert O. Copeland, hereinafter referred to as Trustee.
>
> WHEREAS, DELCAR INC., this date borrowed a certain sum, evidenced by a Loan Agreement dated this same day and incorporated herein by reference,
> WHEREAS, Settlor wishes to have said loans secured in the event of a default in payment by DELCAR Inc.,
> THEREFORE, Settlor hereby conveys to Trustee his ownership in DELCAR Inc., including the right to redeem all equity interest in the business to Allstate Insurance Company for the purpose set forth herein:
>
> Article One
>
> Trustee shall function in a passive role as a contingent owner of DELCAR Inc., so long as the appropriate payments are being made under the provisions of the Loan Agreement previously referenced and incorporated hereunder.
>
> Article Two
>
> Should the loan referenced in Article One be in default, Trustee shall assume active ownership of DELCAR Inc., and is granted authority under the trust to exercise the right held by the corporation to redeem all equity interest to Allstate Insurance Company.
>
> Article Three

> Trustee shall collect the proceeds from redemption from Allstate as soon as is practical following the default condition of the loan(s), and shall distribute same to the Trust beneficiaries in the amount necessary to satisfy the remaining principal and unpaid interest of each beneficiary/creditor of DELCAR Inc. Any proceeds remaining after each beneficiary has been satisfied are to revert to Settlor.
>
> Article Four
>
> In the event of death the Settlor [sic] prior to the complete satisfaction of the loan(s), Trustee is empowered to receive life insurance proceeds on the life of settlor, and use the same proceeds to satisfy all remaining principal and unpaid interest owed to all beneficiary/creditors of DELCAR Inc.
>
> Article Five
>
> The beneficiaries of the Trust, and the amount of their initial loan, are listed on Addendum A of this Agreement. Additional beneficiaries may be added, with the same entitlements, should other secured loans be necessary. Total loans outstanding secured by this Trust Agreement shall never exceed 75% of DELCAR Inc.'s equity interest that year.
>
> IN WITNESS WHEREOF, the parties of this AGREEMENT have hereunder set their hand and have caused this instrument to be executed the date [sic] first written above

The CTA was, in each instance, signed by Robert O. Copeland and by Paul Melby as "President DELCAR INC., DBA Allstate Insurance Company." Appended to the CTA was a list of "Trust Beneficiaries" that, at the bottom, identified a "Total to Beneficiaries" and an amount described as an "Agency Guarantee."

The Appellants loaned the following amounts of money on the following dates:

| | | |
|---|---|---|
| June 7, 1996: | Barbara Davidson | $10,000 |

| | | |
|---|---|---|
| June 7, 1996: | Lynne Goughler | $10,000 |
| June 20, 1996: | Gail and Robert Atkins | $30,000 |
| August 2, 1996: | Hazel Davidson | $50,000 |
| July 21, 1997: | Gail and Robert Atkins | $35,000 |

By February of 1998, the Appellants, together with the other investors who received an ECO and CTA (collectively, the "CTA Investors"), had loaned DELCAR $355,000.

Melby used the moneys loaned by the CTA Investors to fund the operation and expansion of not only the DELCAR agency but also two other Allstate agencies in which Melby purchased a controlling interest. On or about June 1, 1996, Melby bought a majority of the shares in Greenberg, Inc. ("the Greenberg agency"). On or about August 15, 1996, Melby purchased all of the shares of an agency called Abercrombie & Associates ("the Abercrombie agency"). As part of these transactions, Melby's new agencies signed promissory notes requiring the agencies to make significant monthly payments to the former owners of the agencies for a period of several years.

Despite the loans made by the CTA Investors, Melby continued to have cash flow problems. Copeland made several short-term loans to DELCAR which were typically repaid within a few months. The largest of these loans was for approximately $50,000 in late 1996. Melby also asked Copeland to help him find additional third-party financing for his agencies. Copeland put Melby in touch with a loan broker named Grover Jones ("Jones"). Melby worked with Jones in late 1996 to prepare a proposal for presentation

to institutional lenders. Ultimately, Jones connected Melby with Itasca Business Credit ("Itasca"), located in the Twin Cities.

On February 5, 1997, Itasca loaned a total of $250,000 to Melby's three agencies, consisting of $83,333.33 to each agency. Itasca later made additional loans to the agencies so that, as of October 8, 1998, each of Melby's agencies owed Itasca $108,333.34. As security for these loans, each agency gave Itasca a blanket lien on virtually all of its assets, including the guaranteed "termination payment" from Allstate. Melby guaranteed the loans personally, as did Allstate. Following the Itasca closing, Melby wrote Copeland a check for $50,000 to repay Copeland for the loan made in late 1996.

By late 1998, Melby was in serious financial trouble and became unable to make scheduled payments to the CTA Investors, the former owners of the Abercrombie and Greenberg agencies, and Itasca. At this time, Copeland was no longer employed by Allstate and, therefore, was no longer Melby's agency manager. Unbeknownst to Copeland, in late October 1998, Melby contacted Allstate regarding his financial troubles. Melby sent loan documents relating to the CTA Investors and the Itasca loans to Allstate and, through his attorney, tried to negotiate a solution by which everyone would get paid. Allstate and Melby each had a vested interest in seeing that Itasca was paid off in full, however, because each of them had guaranteed the loans Itasca made to the three agencies.

In or about December of 1998, the CTA Investors began telling Copeland that DELCAR had failed to make scheduled interest payments. Pursuant to the ECO DELCAR would be in default once the monthly interest payments became more than 90 days in arrears. Copeland contacted Melby about the status of the interest payments to the CTA Investors and was told that Melby was trying to find a solution that would satisfy all of the creditors, including the CTA Investors. In early 1999, the former owners of the Abercrombie and Greenberg agencies notified Melby that the agencies had defaulted on their obligations; the former owners enforced their rights under their security agreements and took back their agencies.

Once DELCAR was in default under the ECO, Copeland took several steps to demand that Allstate make the termination payment described in the DELCAR agency agreement. Melby, however, took no steps to comply with his obligations under either the ECO or the CTAs and did not cooperate with Copeland to turn DELCAR over for termination. Rather, Melby continued trying to arrange a deal with Allstate. As for Allstate, it also stonewalled Copeland. Allstate initially ignored the demands of the CTA Investors, Copeland, and their counsel. It then negotiated directly with the CTA Investors while keeping Copeland and his counsel in the dark.

On April 7, 1999, Allstate sent Melby a letter notifying him that it was terminating the DELCAR agency agreement effective August 1, 1999. Allstate claimed that Melby had violated the agency agreement by "assigning the economic interest in the Agency to

unapproved third parties to obtain loans without Allstate's knowledge or approval and improperly obtaining the loans and binding Allstate without obtaining Allstate approval." The bankruptcy court expressly found that, if the termination letter was referring to the loans from the CTA Investors, Allstate's termination was wrongful because it had pre-approved the arrangements when it reviewed the final ECO and CTA. If the termination letter was referring to the Itasca loans, the bankruptcy court found that Allstate's termination was again wrongful because it had authorized the loans.

From April 1999 forward, Allstate used DELCAR's commission income to pay down the Itasca loans. In August of 1999, the DELCAR agency was sold to a substitute agent approved by Allstate for approximately $275,000.00. Between the DELCAR commission payments and the sale of the DELCAR agency, Itasca received approximately $300,000 and was paid off in full on its loans to not only the DELCAR agency but also the Greenberg and Abercrombie agencies. All but $5,000 of the sale price for the DELCAR agency was attributable to Melby's "equity interest" in the agency, which Melby would otherwise have received in the form of a termination payment. The CTA Investors received nothing.

**Analysis**

**I. Standard of Review**

In bankruptcy proceedings, a district court acts as an appellate court, applying the same standard of review that the Court of Appeals applies. See Waugh v. Internal

Revenue Serv. (In re Waugh), 109 F.3d 489, 491 (8th Cir. 1997). When a party appeals a bankruptcy court judgment to the district court, the district court reviews the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. See Pagosa Lakes Property Owners' Ass'n v. Fairfield Pagosa, Inc. (In re Fairfield Pagosa, Inc.), 97 F.3d 247, 252 (8th Cir. 1996). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 541 (1948). In applying the clearly erroneous standard, a reviewing court must be mindful that its function "is not to re-decide the factual issues de novo." Garlington v. St. Anthony's Hosp. Ass'n, 792 F.2d 752, 754 (8th Cir. 1986) (emphasis added).

Appellants' failure to acknowledge the appropriate standard of appellate review has complicated this Court's task on appeal. Appellants have tried to characterize every issue as subject to de novo review, ignoring the fact that the legal conclusions reached by the bankruptcy court are premised upon findings of fact made after hearing three days of testimony and wading through over one hundred and thirty exhibits. Based on this Court's review of the briefs on appeal, it appears that, subsumed within the challenges to the bankruptcy court's legal conclusions, Appellants challenge the following findings of fact:

- Copeland made short-term loans to Melby, as president of DELCAR, in order to

facilitate Melby's operation and expansion of that agency; such loans from an agency manager were customary within Allstate; and such loans benefitted DELCAR. (Findings of Fact, Conclusions of Law, and Order for Judgment, ¶ 1.)

- Melby, not Copeland, asked Richard Poulton to cobble together the ECO and the CTA. (Findings, Conclusions, and Order, ¶ 7.)

- Copeland's role in the Itasca loan transaction was limited. (Findings, Conclusions, and Order, ¶ 14.)

Appellants also challenge the following legal conclusions made by the bankruptcy court:

- The provision in the CTA stating that "total outstanding loans secured by this Trust Agreement shall never exceed 75% of DELCAR Inc.'s equity interest that year" is ambiguous, and the "agency guarantee" stated on the listing of "Trust Beneficiaries" (appended to the CTA) means the equity value of the DELCAR agency and the equity value of the Greenberg and Abercrombie agencies. (Findings, Conclusions, and Order, ¶ 24.)

- Copeland did not, as the Trustee named in the CTA, breach his fiduciary duties to the Appellants by (a) allowing the total owed to the CTA "beneficiaries" to exceed 75% of DELCAR Inc.'s "equity interest;" (b) allowing the "equity interest" in the DELCAR Inc. agency to be used as collateral for Itasca; (c) failing to disclose to Itasca the existence of the CTA Investors and their purported claim to DELCAR Inc.'s "equity interest;" and (d) using the trust to obtain money for his own purposes.

- Copeland did not commit fraud against the Appellants.

The Court begins with the challenged findings of fact.

## II. Challenged Findings of Fact

The first set of findings challenged by Appellants involves Copeland's loans to Melby. Upon reviewing the entire record, the Court concludes that there is ample evidence to support the bankruptcy court's findings that (1) Copeland made short-term

loans to Melby in order to facilitate the operation and expansion of the DELCAR agency, (2) such loans from an agency manager were customary within Allstate, and (3) Copeland's loans benefitted DELCAR. Several of the DELCAR checks made payable to Copeland (which Appellants introduced into evidence through Melby) state "repayment of loan" on the memo line; Melby further testified with respect to other checks that they were for repayment of loans made by Copeland. (Melby Tr. at 26-30 & Ex. 70.) Melby testified that the money Copeland loaned him on a regular basis was used to help run the business, including sending out promotional materials and mailings. (Melby Tr. at 95.) The record, viewed in its entirety, does not create a "definite and firm conviction that a mistake has been committed" in making those findings. United States Gypsum Co., 333 U.S. at 395, 68 S. Ct. at 541. Accordingly, those findings of the bankruptcy court will stand.

With respect to Copeland's role in the Itasca transaction, the witnesses' testimony regarding this issue presents obvious credibility issues. Copeland testified about what he did in connection with the Itasca transaction. (Copeland Tr. at 56.) Melby and a representative from Itasca offered contrary testimony to the effect that Copeland played an "instrumental" role. (Melby Tr. at 25; Ex. 81.) The bankruptcy court made explicit findings as to Melby's credibility, or rather, his lack thereof. (Findings, Conclusions, and Order ¶ 13.) Itasca released Melby on his personal guaranty without Melby having to pay one cent to Itasca (id. ¶ 22), and repaid in full for all three loans from the proceeds of the

sale of the DELCAR agency, despite the fact that DELCAR itself owed Itasca less than $100,000.[4] (Id.) Furthermore, while Melby described Copeland's role in the Itasca loan as "instrumental," it is evident from the record that he had virtually no personal knowledge of what Copeland had done or prepared vis-a-vis the loan, basing his testimony largely upon assumption and belief. (See Melby Tr. at 46.)

The bankruptcy court's finding regarding that Copeland's role in the Itasca transaction involved weighing evidence and assessing the credibility of witnesses. "Alleged conflicts in the testimony are to be resolved by the fact finder, and the appellate court should give particular deference to findings based upon credibility determinations." Prince v. Sargent, 960 F.2d 720, 721 (8th Cir. 1992). The bankruptcy court found Copeland's testimony concerning his role in the Itasca transaction more credible than the testimony offered by Appellants and accordingly found that Copeland's role was minimal. This Court does not find a basis in the record to call those findings "clearly erroneous" and will not disturb them.

Appellants have also challenged the bankruptcy court's finding that Melby, not Copeland, asked Richard Poulton to draft the ECO and CTA. This fact is relevant only if and to the extent the CTA and ECO are ambiguous. See In re Air Transp. Excise Tax Litig., 37 F. Supp. 2d 1133, 1141 (D. Minn. 1999) (Alsop, J.) (observing that, under Minnesota law, an ambiguity in an adhesion contract should be construed against the

[4] Appellants did not challenge these findings of fact.

drafter of the contract). Because the Court concludes, infra in section III.A., that the language of the CTA limiting the "total outstanding loans secured by the Trust Agreement" to 75% of DELCAR's equity interest is unambiguous, there is no reason to resolve whether the bankruptcy court's finding was clearly erroneous.

**III. Challenged Conclusions of Law**

**A. Interpretation of the CTA**

Appellants contend that the bankruptcy court erred in holding that the provision in the CTA which states "[t]otal outstanding loans secured by this Trust Agreement shall never exceed 75% of DELCAR Inc.'s equity interest that year" is ambiguous. (Findings, Conclusions, and Order ¶ 23.) "Under Minnesota law, whether a contract is ambiguous is a question of law, and ambiguity is defined as reasonable susceptibility to more than one meaning."[5] Cooper v. Lakewood Eng'g & Mfg. Co., 45 F.3d 243, 245 (8th Cir. 1995) (citing Blattner v. Forster, 322 N.W.2d 319, 321 (Minn. 1982)). Normally, a court must resolve whether a contract is ambiguous without resort to extrinsic evidence. See Opus Corp. v. International Bus. Machs. Corp., 141 F.3d 1261, 1265 n.5 (8th Cir. 1998) (citing In re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d 494, 498 (Minn. 1995)). Thus, "[a] contract is ambiguous when, based on its language alone, it is reasonably susceptible of more than one interpretation." Boat Dealers' Alliance, Inc. v. Outboard

[5] The parties have cited Minnesota law regarding the construction of the CTA. The Court assumes without deciding that Minnesota law applies.

Marine Corp., 182 F.3d 619, 621 (8th Cir. 1999) (emphasis added) (citing Brookfield Trade Ctr. Inc., v. County of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998)).

The bankruptcy court considered evidence beyond the language of the CTA itself in evaluating whether the above-quoted sentence was reasonably susceptible of more than one meaning. The bankruptcy court relied upon trial testimony from Melby and Copeland in order to conclude that a permissible interpretation of the disputed provision was that the total amount of the loans from the CTA investors "would never exceed 75% of the combined equity interests in DELCAR, the Abercrombie agency and the Greenberg agency." (Findings, Conclusions, and Order ¶ 23 (emphasis added).) However, neither the Abercrombie agency nor the Greenberg agency is mentioned in the CTA.

Based solely upon the language of the CTA, the bankruptcy court's proposed interpretation is unreasonable, and the above-quoted sentence is susceptible of only one interpretation regarding whose equity interest is to be compared to the total outstanding loans secured by the CTA.[6] Under Minnesota law, the meaning of an unambiguous contract presents a question of law which must be determined from the language of the contract alone. See Michalski v. Bank of Am., Arizona, 66 F.3d 993, 996 (8th Cir. 1995).

---

[6] The bankruptcy court correctly observed that Article Five is ambiguous as to when one measures DELCAR's equity interest. (Findings, Conclusions, and Order ¶ 23.) The phrase "that year" could reasonably refer to the calendar year, or the twelve-month period immediately preceding a given CTA investor's loan, or DELCAR's fiscal year (if different from the calendar year). However, there is no evidence in the record to suggest that, depending on when DELCAR's year is measured, the 75% cap would be exceeded in one instance but not in another.

This Court concludes that, pursuant to Article Five of the CTA, the amount of the "total outstanding loans secured by this Trust Agreement" must be measured against 75% of the "equity interest" of DELCAR Inc., and DELCAR, Inc. alone.[7]

Although the bankruptcy court erred in construing the CTA, that fact does not resolve whether Copeland's alleged debts to Appellants are non-dischargeable. That inquiry turns upon whether Appellants can establish the essential elements of non-dischargeability under 11 U.S.C. § 523.

**B. Fraud or Defalcation While Acting in a Fiduciary Capacity**

Section 523(a)(4) of the Bankruptcy Code provides that an individual debtor is not discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). From the bankruptcy court's order, it appears that the Appellants did not claim that Copeland engaged in embezzlement or larceny. (Findings, Conclusions, and Order at 26.) Rather, the Appellants alleged that the debt owed to them is non-dischargeable because Copeland breached his fiduciary duty as trustee of the CTA.

---

[7] Appellants argue that the "total outstanding loans" referenced in Article Five should include DELCAR's indebtedness to Itasca The bankruptcy court rejected this interpretation, and this Court agrees. Appellants argument is based upon an incomplete reading of the sentence and specifically ignores the clause: "secured by this Trust Agreement." There is no evidence that Melby issued a CTA to Itasca or intended to "secure" DELCAR's indebtedness to Itasca with a CTA instrument. Therefore, there is no contractual basis for including the Itasca loan in the "total outstanding loans secured by this Trust Agreement."

To prevail under the "fraud or defalcation while acting in a fiduciary capacity" exception to discharge, Appellants must prove that (1) a fiduciary relationship existed between Copeland and them, and (2) Copeland engaged in fraud or defalcation in the context of that fiduciary relationship. See Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane), 124 F.3d 978, 984 (8th Cir. 1997); Speight v. Laughter (In re Speight), 16 F.3d 287, 287 (8th Cir. 1994). The bankruptcy court noted that the parties did not dispute whether a fiduciary relationship existed because the CTA had specifically named Copeland as the trustee. (Findings, Conclusions, and Order at 27.) The bankruptcy court defined the dispositive issue as whether Copeland engaged in defalcation while acting as the trustee.[8] (Id.)

On appeal, Appellants argue that the following grounds provided a basis for the bankruptcy court to determine that Copeland engaged in defalcation: (a) Copeland allowed the total of the outstanding loans from the CTA "beneficiaries" to exceed 75% of DELCAR Inc.'s equity interest; (b) Copeland allowed the equity interest in the DELCAR Inc. agency to be used as collateral for the loan from Itasca; (c) Copeland failed to tell Itasca about the existence of the CTA Investors and their purported claim to DELCAR

---

[8] The Eighth Circuit Court of Appeals defines defalcation as "the misappropriation of trust funds or money held in any fiduciary capacity; the failure to properly account for such funds." Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane), 124 F.3d 978, 984 (8th Cir. 1997) (quoting Lewis v. Scott, 97 F.3d 1182, 1186 (9th Cir. 1996)) (internal quotation marks and brackets omitted). Defalcation does not require evidence of intentional fraud or other intentional wrongdoing. See id.

Inc.'s equity interest; and (d) Copeland used the trust to get money for his own purposes. (Appellants' Br. at 11.) All of these arguments assume that, when the events in question took place, Copeland was an active trustee who had the power and duty to manage and control the trust res – the corporation. In support of their arguments, Appellants cite language from the preamble of the CTA stating that Melby was transferring the ownership of DELCAR Inc. to Copeland. Appellants' interpretation is not, however, based upon the language of the CTA viewed as a whole and is belied by the first two substantive provisions of the CTA.

To create an express private trust, the settlor must give his trustee affirmative powers and duties. Bogert, The Law of Trusts and Trustees § 206. A trustee derives his or her authority from the instrument creating the trust; therefore, each question involving the scope of the trustee's duties "must be decided in light of the provisions of the particular trust instrument." Sword v. Marquette Nat'l Bank of Minneapolis, 91 N.W.2d 75, 76, 252 Minn. 544, 546 (1958). "The powers conferred on a trustee under a trust agreement should be measured not only by the language employed but also by the purpose and object for which the trust was created." Warner Hardware Co. v. Shimon, 242 N.W. 718, 720, 186 Minn. 229, 234 (1932).

Thus, as the bankruptcy court observed, the settlor of an express trust may limit the trustee's powers and duties through the trust agreement. Here, Articles One and Two of the CTA condition Copeland's possession and control of the trust res -- the corporation --

upon whether DELCAR was in default on the payments due under the ECOs. Article One expressly states that the Trustee "shall function in a passive role as a contingent owner of DELCAR Inc. so long as the appropriate payments are being made under the provisions of the Loan Agreement previously referenced and incorporated hereunder."[9] (Appellants' App. at A-40 (emphasis added).) Not until the loan ECO is in default shall Copeland "assume active ownership of DELCAR, Inc., and is granted authority under the trust to exercise the right held by the corporation to redeem all equity interest to Allstate Insurance Company." (Id. (emphasis added).) The foregoing reading of the CTA is consistent with Melby's testimony regarding his intent in creating the "collateral trust." (Melby Tr. at 70-71.) So long as DELCAR remained current on its payments to the CTA Investors, Melby remained in charge of DELCAR. The record indicates that Melby in fact continued to run the DELCAR agency as his business and continued to execute documents (including additional ECOs) as the president of the corporation.

Only when DELCAR defaulted on its obligations to the CTA Investors, or Melby died, could Copeland take control of the company. In that event, however, his powers were limited to liquidating the agency with Allstate and distributing the equity interest in DELCAR to the CTA Investors to satisfy any remaining indebtedness to them. DELCAR

---

[9] Appellants introduced into evidence no document entitled "Loan Agreement" that relates to the loans made by the CTA Investors to DELCAR. Presumably, the reference to the "Loan Agreement" is actually meant to be to the "Evidence of Corporate Obligation" that Poulton drafted together with the CTA.

did not default on its obligations until late in 1998. According to the terms of the CTA, Copeland had no power or concomitant duty prior to that date to exercise control over the operations of DELCAR. As the bankruptcy court properly concluded, Copeland had no power or duty to prevent DELCAR from pledging the equity interest in the DELCAR agency as collateral for the loan from Itasca.[10] Therefore, that alleged failure to act cannot serve as a basis for holding that Copeland engaged in "defalcation."

With respect to the Appellants' claim that Copeland's debt should be non-dischargeable because he allowed the loans to exceed the "75% cap" stated in the CTA, this Court determines that there is no basis, as a matter of law, for holding that Copeland's conduct in that regard constitutes "defalcation." As discussed above in section III.A, the cap on loans to be "secured" by the CTA was 75% of the "equity interest" Allstate would recognize in the DELCAR agency. It further appears from the record that DELCAR borrowed more from the CTA Investors than that 75% cap. The bankruptcy court rejected the Appellants' defalcation claim on the grounds that, based on its calculation of the cap, DELCAR never exceeded it. Although the bankruptcy court's

---

[10] Melby, throughout his trial testimony, reiterated that he was "relying on Copeland" to take care of his business affairs. Thus, "relying on Copeland" was Melby's excuse for not reading or understanding the documents associated with the purchase of the Abercrombie and Greenberg agencies, not paying attention to the total amount of the loans secured by the CTAs, and not reading or understanding the loan documents associated with the Itasca loan. The bankruptcy court expressly found that Melby's testimony, which placed all of the responsibility and blame on Copeland's shoulders, was not credible. This Court agrees.

reasoning is not supported by the terms of the CTA, this Court finds that the result reached by the bankruptcy court is nevertheless correct.

This holding is again based in the terms of the CTA. So long as DELCAR was current on its obligations to the CTA Investors, Copeland had no active role in DELCAR and Melby remained in control of that business. Thus, Copeland had no power under the Trust Agreement (and no concomitant duty) to prevent DELCAR from obtaining loans from the CTA Investors. Melby remained free, as the president and sole shareholder of DELCAR, to execute ECOs on behalf of the corporation and/or to ratify loans obtained by Copeland. Therefore, Copeland's failure to prevent DELCAR from exceeding its borrowing cap cannot constitute "defalcation."

Similarly, with respect to the Itasca loan transaction, Copeland had no authority, as a "passive" trustee, to speak on behalf on DELCAR. Hence, he had no duty to inform Itasca about the CTAs or the CTA Investors.[11] Finally, as the bankruptcy court found, any loans made by Copeland to DELCAR benefitted DELCAR (for example, by helping DELCAR meet operational expenses). Therefore, Copeland did not breach a fiduciary duty to the "beneficiaries" of the CTA by accepting repayment from DELCAR for those loans.

None of the grounds advanced by the Appellants for holding that Copeland had

---

[11] Indeed, the evidence supports the bankruptcy court's finding that Copeland in fact provided that information to Grover Jones, the loan broker who prepared the presentation to Itasca. The Appellants have not challenged that finding.

engaged in "defalcation" while acting in a fiduciary capacity is substantiated by the terms of the CTA or by the law of trusts. Accordingly, this Court will affirm the bankruptcy court's holding that Appellants have failed to prove that Copeland's debt to them is non-dischargeable pursuant to § 523(a)(4).

**C. Fraud against Beneficiaries**

Appellants also appeal from the bankruptcy court's rejection of their claim that Copeland's debt should be rendered non-dischargeable pursuant to § 523(a)(2)(A). That section provides that a discharge in bankruptcy does not include a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. §523(a)(2)(A). Appellants contend on appeal that Copeland's debt to them should not be dischargeable because of fraud. Specifically, Appellants contend that Copeland "assured the Appellants that the collateral trust agreements would adequately protect their investments." (Appellants Br. at 18.)

To establish that the "fraud" exception to discharge applies, the Appellants must prove by a preponderance of the evidence the requisite elements of fraud, including the elements that Copeland knew that the representations complained of were false and that Copeland intended to deceive the Appellants. See Alport v. Ritter (In re Alport), 144 F.3d 1163, 1166-67 (8th Cir. 1998). It is not enough to establish that the debtor was

negligent. Cf. Field v. Mans, 516 U.S. 59, 70, 116 S. Ct. 437, 443-44 (1996) (reasoning that concept of "actual fraud," added to § 523(a)(2)(A) in 1978, was understood as referring to the intentional tort of fraudulent misrepresentation). As for the element of intent, it "does not require a finding of malevolence or personal ill-will; all it requires is a showing of an intent to induce the creditor to rely and act on the misrepresentations in question." Moodie-Yannotti v. Swan (In re Swan), 156 B.R. 618, 623 n.6 (Bankr. D. Minn. 1993) (citing In re Hunter, 771 F.2d 1126, 1129 (8th Cir.1985)).

Appellants specifically complain that Copeland "failed to disclose to his beneficiaries that the property he held for their benefit would be mortgaged to another lender and that Copeland would be repaid money owed to him." (Appellants' Br. at 19.) With the exception of the Atkinses' second loan of $35,000, the Appellants had all made their loans to DELCAR before Itasca made its loan to DELCAR. Nor is there any evidence that (with the possible exception of the Atkinses) Copeland knew that DELCAR was planning to offer the equity interest in the agency as security for a loan from Itasca. Therefore, this "failure to disclose" cannot form the basis for a non-dischargeability determination. As for the Atkinses, Itasca filed a UCC-1 to record its security interest in DELCAR's assets, which is a matter of public record. Therefore, the Atkinses failed to establish that their reliance on Copeland's silence was justifiable.

With respect to the affirmative representation Copeland allegedly made to the Appellants – that "the collateral trust agreements would adequately protect their

investments" – there is no evidence to suggest that, when that representation was made, Copeland knew it to be false. On the contrary, the record establishes that both Copeland and Melby mistakenly believed that DELCAR, the Greenberg agency and the Abercrombie agency were one business for purposes of the day-to-day operations of the business and for calculating the "equity interest" that secured the CTA Investors' loans. (Melby Tr. at 77, 106-07.) Thus, Copeland understood (albeit erroneously) that there was an adequate "equity interest" from the three agencies combined to cover the loans made by the Appellants. Negligence with respect to such facts does not give rise to a "fraud" or "false representation" that would render the debt non-dischargeable.

**Conclusion**

Based on the foregoing, and all of the records, files and proceedings herein, **IT IS ORDERED THAT** the Order for Judgment of the United States Bankruptcy Court for the District of Minnesota is **AFFIRMED**.

Dated: September 6, 2000

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES: SEP 06 2000

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> ***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.